**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JAMES P.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 20 C 2355** |
| | ) | |
| **KILOLO KIJAKAZI, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Plaintiff James P. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the Commissioner's decision should be reversed or the case remanded. The Commissioner responded with a motion for summary judgment seeking to affirm the decision. After careful review of the record and the parties' respective arguments, the Court affirms the ALJ's decision.

## BACKGROUND

Plaintiff applied for DIB on February 6, 2014, alleging he became disabled on October 10, 2008 due to a back injury, arthritis following knee and carpal tunnel surgeries, chronic pain, depression, and chronic obstructive cardiopulmonary disease. He later amended the alleged disability onset date to August 1, 2012. Born in 1961, Plaintiff was

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. She is automatically substituted as the named defendant pursuant to FED. R. CIV. P. 25(d).

52 years old at the time of his application. He graduated from high school, completed specialized training as a welder, and held several jobs over the following decades, including: retail stock handler (September 1987 to July 1994); assistant building engineer (June 1994 to February 2001); and hardware supervisor (June 2001 to June 2003). Plaintiff last worked as a supervisor at a home improvement store from June 2003 until October 2008, when he quit at age 47 due to back pain. (R. 45, 47, 160, 185, 186). He did not try to do any jobs after this, spending his days helping his wife whose health had started getting bad at this time. (R. 52). Plaintiff's date last insured ("DLI") was December 31, 2013. (R. 1791).

The Social Security Administration denied Plaintiff's application at all levels of review, and he appealed to the district court. On May 8, 2019, this Court remanded the case for further evaluation of the proper weight to assign a September 19, 2014 opinion from Steven E. Mather, M.D., Plaintiff's treating orthopedic surgeon, that Plaintiff had been unable to work for several years due to lumbar degenerative disc disease. Specifically, the Court disagreed with the determination by administrative law judge Edward P. Studzinski (the "ALJ") that the opinion was entitled to no weight because it "referred to an impairment assessed after the date last insured." (R. 25, 1954-58). The Court also advised the ALJ to take the opportunity on remand to address his determination that Plaintiff could be on his feet standing or walking for 8 hours a day when the State agency reviewers found he could not do so for more than 6 hours in an 8-hour workday, as well as his determination that Plaintiff would not be off task while changing positions to alleviate pain. (R. 1958). The Appeals Council vacated the Commissioner's prior decision and remanded the case for further proceedings. (R. 1962).

2

ALJ Studzinski held a new hearing on November 22, 2019.  (R. 1854).  He heard testimony from Plaintiff, who was represented by counsel, and from vocational expert Clifford M. Brady (the "VE").  (R. 1856-1907).  On December 27, 2019, the ALJ found that Plaintiff's degenerative joint disease of the left knee, degenerative disc disease of the lumbar spine, and history of cubital/carpal tunnel syndrome in the left upper extremity were severe impairments through the date last insured but did not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 1792-93).  After reviewing the medical and testimonial evidence, the ALJ affirmed his previous decision that prior to the DLI, Plaintiff had the residual functional capacity ("RFC") to perform a restricted range of light work involving: occasional lifting of up to 20 pounds; frequent lifting of up to 10 pounds; occasional climbing of ramps and stairs; occasional stooping, kneeling, balancing, crouching, and crawling; no climbing of ladders, ropes, or scaffolds; no concentrated exposure to pulmonary irritants such as fumes, odors, dusts, gases, and poor ventilation; and no working in hazardous environments.  (R. 1796-97).  Plaintiff also had "no limitations in the total amount of time he was able to sit, stand, or walk throughout an 8 hour workday," but "needed to alternate his position between sitting, standing, and walking for no more than five minutes out of every half hour."  (R. 1796).  The ALJ again concluded that while Plaintiff was alternating positions, he would not need to be off task. (*Id.*).

The ALJ accepted the VE's testimony that a person with Plaintiff's background and RFC could not perform any past work but could handle other jobs that exist in significant numbers in the national economy, including bench assembler, electronics worker, and production assembler.  (R. 1804-06).  Accordingly, the ALJ concluded that Plaintiff was

not disabled at any time prior to the date last insured. (R. 1805). The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by this Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

In support of his request for reversal or remand, Plaintiff argues that the ALJ: (1) erred in once again giving no weight to the opinion from his treating orthopedic surgeon, Dr. Steven Mather; (2) made a flawed RFC assessment that was unsupported by medical evidence; and (3) improperly evaluated his subjective statements regarding the limiting effects of his symptoms. For the reasons discussed in this opinion, the Court finds that the ALJ's decision is supported by substantial evidence.

## **DISCUSSION**

### I.      **Governing Standards**

#### A.      **Standard of Review**

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the Social Security Act (the "SSA"). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). *See also L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1151-52 (7th Cir. 2019). The Court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

In making its determination, the Court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)). When the ALJ's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

### B.    Five-Step Inquiry

To recover disability benefits under the SSA a claimant must establish that he is disabled within the meaning of the SSA. *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016). A claimant is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4)

if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520). If the claimant meets his burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

## II.    Analysis

### A.    Dr. Mather's Opinion

Plaintiff argues that the case must be reversed or remanded because the ALJ erred in once again giving no weight to Dr. Steven Mather's September 19, 2014 opinion that Plaintiff's lumbar degenerative disc condition had rendered him unable to work for several years prior to the December 31, 2013 date last insured. (Doc. 15, at 4-7). A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). If the opinion is contradicted by other evidence or is internally inconsistent, the ALJ may discount it so long as he provides an adequate explanation for doing so. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). That is to say, an ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott*, 647 F.3d at 739, and then determine what weight to give it considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment

relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the attention of the ALJ. 20 C.F.R. § 404.1527(c)(2)-(6); *see Simila*, 573 F.3d at 515. Although the guidelines regarding medical opinion evidence have changed, this standard applies since Plaintiff filed his claim prior to March 27, 2017. 20 C.F.R. § 404.1520c(a); 20 C.F.R. § 404.1527.

In affording Dr. Mather's opinion no weight, the ALJ first found it unsupported by the objective record. The Court finds no error in this assessment. Plaintiff first sought treatment for back pain in August 2007, almost 5 years before the August 1, 2012 alleged disability onset date, because he threw his back out at work while lifting some tile. (R. 513-14, 1795). The doctor diagnosed lumbar strain and prescribed a Medrol Dose-Pak and ibuprofen. (R. 514, 1795). Six years later on April 15, 2013, Plaintiff saw his family medicine doctor, Brian A. Adrian, M.D., for a follow-up on his hypertension, and complained of constant, aching pain in his back, neck, and legs. (R. 549). Dr. Adrian did not document any objective findings but prescribed Tylenol with codeine, noting that Plaintiff could not take anything stronger due to narcotic abuse. (R. 551).

Plaintiff made no complaints about back pain when he saw Dr. Adrian on May 3, 2013, August 26, 2013, or September 5, 2013, and the doctor did not mention a pain diagnosis on any of those occasions. (R. 538, 542, 546). Though Plaintiff raised the issue again on November 4, 2013, a physical exam showed only normal gait and posture with no indication of any abnormal testing in the neck or back, and no evidence of any acute distress. (R. 535-36, 1795, 1798). Dr. Adrian diagnosed chronic pain and

instructed Plaintiff to continue taking Tylenol with codeine. He also provided a referral for acupuncture at Plaintiff's request. (R. 536, 1795-96, 1798). Plaintiff once again exhibited a normal gait and posture on December 16, 2013, and there was no documented evidence of any abnormality of functioning in the neck or back. (R. 534). Dr. Adrian indicated Plaintiff had an appointment with a pain management specialist. (*Id.*). A few weeks later on December 26, 2013, Dr. Adrian referred Plaintiff for an MRI of the lumbar spine and indicated that the pain specialist would evaluate him for possible steroid injections. (R. 532, 534). As noted, Plaintiff's DLI was December 31, 2013.

Sometime in early January 2014, Plaintiff tried to move a grandfather clock, exacerbating his symptoms of back pain. (R. 580, 1799). Shortly thereafter, on January 15, 2014, Plaintiff's MRI of the lumbar spine showed "[f]ocal prominent left paracentral disc protrusion at L5-S1," which the radiologist posited "may be the etiology of [Plaintiff's] symptoms," and mild Oster arthritis and disc disease from L3 to L5. (R. 572-73, 1796, 1799). On January 22, 2014, Plaintiff saw pain specialist Sachin K. Bansal, M.D. for his back pain. Dr. Bansal noted that Plaintiff was "very fixated on oral pain medications" and interrupted him "multiple times" to focus on "opiate medications." (R. 601). Dr. Bansal also indicated that he was unable to conduct a physical examination to assess Plaintiff's lumbar functioning and coordination because he refused to perform the tests due to fear about pain. (R. 602). Dr. Bansal gave Plaintiff one refill of Tylenol with codeine, suggested he see a specialist to wean off his opiate medications, and recommended he have a surgical consultation. (*Id.*).

On January 29, 2014, Plaintiff saw neurosurgeon Dmitry Ruban, M.D., and reported that he had been experiencing back pain for 20 years, with his most recent flare-

up occurring in early January 2014 when he tried to move the grandfather clock. (R. 583). Plaintiff exhibited full strength of 5/5 in his legs but was "somewhat poorly cooperative with the left lower extremity exam." (*Id.*). Sensation was grossly intact to light touch and deep tendon reflexes were symmetric. (*Id.*). Dr. Ruban concluded that based on his review of the MRI, Plaintiff suffered from disc degeneration with Modic changes at L5-S1 and chronic disc bulge with some compression of the S1 nerve root and foraminal stenosis. (*Id.*). Dr. Rubin diagnosed Plaintiff with chronic low back pain with radiculopathy into the left leg and suggested that he see an orthopedic surgeon. (*Id.*).

Two weeks later on February 13, 2014, Plaintiff had his first appointment with Dr. Mather. On examination, Plaintiff stood with normal alignment but had pain across the lower back, pain with range of motion down the left leg and in the central back, and a palpable "step-off" (misalignment). (R. 610, 1802). A motor exam showed "mild weakness of the left foot plantar flexors at 4/5" with no left ankle reflex and "numbness in the lateral aspect of the left foot." (*Id.*). A straight leg raise test was positive and reproduced radicular pain down Plaintiff's left leg. (*Id.*). Dr. Mather diagnosed severe degenerative disc disease and severe foraminal stenosis at L5-S1, as well as a large left L5-S1 disc herniation and spondylolisthesis. (*Id.*). He recommended surgical intervention and performed a lumbar laminectomy and fusion on March 5, 2014. (R. 652-54, 1802).

Following surgery, Plaintiff experienced tremors, hallucinations, persistent confusion, and severe agitation attributed to narcotic and alcohol withdrawal with persistent encephalopathy. (R. 647, 1802). Hospital treatment notes from Plaintiff's discharge on April 4, 2014 indicated that he eventually would be placed in a nursing facility due to his inability to care for himself. (R. 634, 1802). Following discharge from the

hospital, Plaintiff was admitted to a nursing and rehabilitation center, where his rehabilitation "focused largely on his cognitive impairments" which had developed following surgery. (R. 708). Plaintiff engaged in physical and occupational therapy at the rehabilitation center before he was discharged and returned home on April 18, 2014. (R. 684-86). There is no indication in the record that Plaintiff followed up with Dr. Mather after the surgery or that he received further physical or occupational therapy. On September 19, 2014, however, Dr. Mather submitted his letter stating that Plaintiff had been unable to work for several years due to his lumbar degenerative disc condition. (R. 719).

Plaintiff did not seek back treatment again until March 2015, nearly a year after his April 2014 discharge from the nursing and rehabilitation center following surgery. (R. 1237). In late March 2015 through May 2015, Plaintiff complained of lower back pain during a series of appointments with pain specialist Martin Fetzer, D.O. (R. 1270-71). A lumbar MRI showed "post surgical changes and adjacent segment breakdown," and Dr. Fetzer told Plaintiff to continue taking gabapentin, trial an injection at left L4, continue his normal activities, and avoid bedrest. (R. 1213). Notes reflect that Plaintiff's gait was normal and that he said he was able to eat, bathe, use the toilet, dress, and get up from a bed or chair independently. (R. 1211). Then in June 2015 Plaintiff started seeing pain specialist Nicholas P. Kondelis, M.D., and received lumbar branch blocks in September and October 2015. (R. 1210-13, 1470-85, 1796).

In discussing this evidence, the ALJ noted that when Plaintiff first started complaining about back pain to Dr. Adrian in 2013, there were no physical abnormalities documented and no evidence of any functional limitations. Dr. Adrian simply observed

that Plaintiff had normal gait and posture and was not in acute distress. (R. 1795, 1798). And though Plaintiff did have lumbar surgery in March 2014, Dr. Mather examined him only once before the procedure (February 13, 2014) and never saw him again after his discharge from the hospital in April 2014. (R. 1802). Moreover, Plaintiff himself testified that after having surgery his back felt better for about one and a half to two years. (R. 1872-73).

Given this history, the ALJ reasonably discounted Dr. Mather's September 2014 opinion that Plaintiff had been completely unable to work for years before Dr. Mather ever met him, including during years when Plaintiff was not seeking or receiving any treatment for back pain. Contrary to Plaintiff's suggestion, the mere fact that Plaintiff's spinal impairment existed during the insured period is not evidence that it caused disabling limitations. *See, e.g., Weaver v. Berryhill*, 746 F. App'x 574, 578-79 (7th Cir. 2018) ("[Plaintiff] having been diagnosed with these impairments does not mean they imposed particular restrictions on her ability to work. . . . It was [Plaintiff]'s burden to establish not just the existence of the conditions, but to provide evidence that they support specific limitations affecting her capacity to work.").

Significantly, both State agency reviewers found Plaintiff capable of light work prior to the December 31, 2013 DLI notwithstanding his back problems. On May 15, 2014, Vidya Madala, M.D., opined that Plaintiff could: occasionally lift 20 pounds; frequently lift 10 pounds; and occasionally climb, balance, stoop, kneel, crouch, and crawl. (R. 72-73). On November 12, 2014, Lenore Gonzalez, M.D., affirmed Dr. Madala's findings but added a limitation to no climbing of ladders, ropes, or scaffolds. (R. 84-86). The ALJ accepted these opinions and incorporated the stated restrictions into the RFC assessment. (R.

1801).  Plaintiff does not challenge the weight given to the State agency opinions or dispute that they contradict Dr. Mather's opinion.

Instead, Plaintiff faults the ALJ for failing to consider the factors set forth in 20 C.F.R. § 404.1527(c)(2), most importantly the fact that Dr. Mather is an orthopedic surgeon.  (Doc. 15, at 6).  But the ALJ expressly noted that Dr. Mather is the surgeon who performed Plaintiff's lumbar fusion and discussed the short nature of the treatment relationship with no follow-up visits after April 2014.  (R. 1802).  This, combined with the ALJ's discussion of the contradictory objective medical records, satisfies the requirement that the ALJ "minimally articulate" his reasoning for rejecting Dr. Mather's opinion.  *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022).  *See also Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) ("[W]e read the ALJ's decision as a whole and with common sense.").

Plaintiff next objects that the ALJ erred in discounting Dr. Mather's opinion on the grounds that he "did not provide a function-by-function description of how the symptoms of the impairment would have specifically prevented [Plaintiff] from performing any work-related activity."  (R. 1802).  Plaintiff argues this was improper because "[i]t is well-established that a treating physician is not required to provide a function-by-function analysis or explanation of what a claimant can do."  (Doc. 15, at 7) (quoting *King v. Berryhill*, No. 17 C 8712, 2018 WL 6179092, at *3 (N.D. Ill. Nov. 27, 2018)).  The Court agrees that an ALJ cannot reject a treating physician's opinion solely because it lacks a function-by-function assessment, and that doing so would constitute error.  *Byndum v. Berryhill*, No. 17 C 01452, 2017 WL 6759024, at *3 (N.D. Ill. Dec. 15, 2017) ("[T]he governing regulations do not require a treating physician to submit a function-by-function

assessment of a patient as part of his opinion, and dismissing a treating physician's opinion for that reason is inappropriate."). As discussed, however, the ALJ also relied on the inconsistency between Dr. Mather's opinion and the objective medical evidence. In such circumstances, the ALJ's observation that Dr. Mather failed to provide a function-by-function assessment is not grounds for reversal. *Regina P. v. Saul*, No. 19 C 3155, 2020 WL 4349888, at *7 (N.D. Ill. July 29, 2020) ("[S]o long as the ALJ provides other supported reasons for discounting the opinion, the ALJ's reference to [a lack of a function-by-function assessment] does not amount to reversible error.").

Plaintiff finally argues that the ALJ should have accepted Dr. Mather's opinion because it was consistent with an opinion from Dr. Kondelis dated August 3, 2016. (Doc. 15, at 7). As noted, Dr. Kondelis started treating Plaintiff in June 2015 and administered lumbar branch blocks in September and October 2015. (R. 1455-56; 1470-85). In his August 2016 opinion, Dr. Kondelis stated that Plaintiff's back pain had worsened since the March 2014 surgery, that "distal radicular symptoms improved but were not resolved by the surgery," and that Plaintiff "should be qualified to receive Social Security disability." (R. 1455-56). Plaintiff argues that this opinion "strongly suggests" that his back condition did not improve after surgery and so "provided more support for Dr. Mather's opinion." (Doc. 15, at 7). This Court disagrees.

The ALJ acknowledged that Dr. Kondelis's opinion was "very detailed and provided information regarding pain location, how it interfered with [Plaintiff's] functioning, and [Plaintiff's] response to treatment." (R. 1802). But the ALJ also noted that Dr. Kondelis did not begin treating Plaintiff until 18 months after the DLI and did not offer an opinion until August 2016, almost three years after the DLI. (*Id*.). Since Dr. Kondelis's opinion

did not reflect Plaintiff's functioning during the relevant time, the ALJ reasonably afforded it no weight. Accordingly, there is no merit to Plaintiff's assertion that Dr. Kondelis's opinion provides a basis for the ALJ to adopt Dr. Mather's opinion regarding Plaintiff's functional abilities prior to December 31, 2013.

The ALJ's decision to discount Dr. Mather's opinion is not a model of clarity, but neither is it unsupported by substantial evidence. "As the Supreme Court observed fairly recently, substantial evidence is not a high standard, and requires only evidence that 'a reasonable mind might accept as adequate.'" *Richard C. v. Saul*, No. 19 C 50013, 2020 WL 1139244, at *5 (N.D. Ill. Mar. 9, 2020) (quoting *Biestek*, 139 S. Ct. at 1154). Viewing the record as a whole, the Court is able to trace the ALJ's reasoning and he has sufficiently built a logical bridge between the evidence and his conclusion. *Charles M. v. Comm'r of Soc. Sec.*, No. 19-CV-1178-JES-JEH, 2021 WL 779979, at *3 (C.D. Ill. Mar. 1, 2021) ("The ALJ need not draft a novel to explain her reasoning. She must minimally articulate it, such that a reviewing court can trace her reasoning and her decision can be subjected to meaningful review."). Plaintiff's request to remand the case for further consideration of Dr. Mather's opinion is denied.

**B. RFC**

Plaintiff next argues that the case requires reversal or remand because the ALJ erred in finding that he has the RFC to perform light work. A claimant's RFC is the maximum work that he can perform despite any limitations. *See* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, at *1-2. "Although the responsibility for the RFC assessment belongs to the ALJ, not a physician, an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions." *Amey*

*v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012). *See also Ana M.A.A. v. Kijakazi*, No. 19 C 7559, 2021 WL 3930103, at *2 (N.D. Ill. Sept. 2, 2021).

The ALJ found that despite suffering from severe degenerative joint disease affecting his left knee, degenerative disc disease of the lumbar spine, and a history of cubital/carpal tunnel syndrome in the left upper extremity, Plaintiff at all times prior to the DLI could occasionally lift up to 20 pounds and frequently lift up to 10 pounds. Plaintiff also had "no limitations in the total amount of time he was able to sit, stand, or walk throughout an 8 hour work day." (R. 1796). Though Plaintiff "needed to alternate his position between sitting, standing, and walking for no more than five minutes out of every half hour," he "would not have needed to be off task" while doing so. (*Id.*).

Plaintiff first notes that this is the same RFC the ALJ assessed before the remand and argues that portions of it violated the law of the case doctrine. The law of the case doctrine "instructs that an administrative agency must 'conform its further proceedings in the case to the principles set forth in the [appellate] decision.'" *Martin v. Saul*, 950 F.3d 369, 375 (7th Cir. 2020) (quoting *Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998)). In evaluating the ALJ's first decision from February 10, 2017, this Court expressed concern that the stated RFC "contemplates that Plaintiff could be on his feet standing and walking for 8 hours a day, but the State agency reviewers found he could not do so for more than 6 hours in an 8-hour workday." (R. 1958). The Court also urged the ALJ to provide greater explanation for why Plaintiff would not be off task while changing positions between sitting, standing, and walking. (*Id.*).

On remand, the ALJ did reiterate in bold the somewhat inartful RFC of "no limitations in the total amount of time [Plaintiff] was able to sit, stand, or walk throughout

15

an 8 hour workday." (R. 1796). Throughout the rest of the decision, however, the ALJ repeatedly clarified that he intended to limit Plaintiff to "light work" (R. 1799, 1800, 1804), which by definition involves standing and walking for only 6 hours in an 8-hour workday and sitting intermittently during the remaining time. 20 C.F.R. § 404.1567(c); *see also* SSR 83-10, 1983 WL 31251, at *6; *Phillips v. Astrue*, 601 F. Supp. 2d 1020, 1029 (N.D. Ill. 2009). The ALJ also affirmatively "agreed" with the State agency reviewers that Plaintiff can perform "light exertional work." (R. 1801). This analysis sufficiently addresses the Court's previous concerns and the case need not be remanded for further clarification.

Plaintiff argues that the ALJ's decision still lacks a proper explanation for why he would not be off task while changing positions. (Doc. 15, at 9). In its remand order, the Court did not find a specific error on this issue and the ALJ interpreted the opinion as questioning the existence of jobs that *allowed* for changing positions without being off task. The ALJ thus provided the following examples designed to articulate the "intent of the limitation." (R. 1800). In the first example, the ALJ contemplated an individual performing work predominantly requiring standing, but with an ability to sit on a stool after 30 minutes and continue working. The ALJ said this arrangement "would provide the change in position necessary to alleviate the individual's pain while still allowing him to perform his tasks." (R. 1800).

In the second example, the individual would perform work involving tasks that required alternating positions, such as sitting for five minutes to make phone calls or complete paperwork after performing tasks that required standing for 30 minutes. (*Id.*). If the work required Plaintiff to primarily sit to answer phones or complete tasks on the

computer, he could stand after 30 minutes for five minutes while remaining on the phone or performing an alternate task, such as filing. (*Id.*). During the supplemental hearing on November 22, 2019, the ALJ asked the VE questions involving these same restrictions (R. 1887), and the VE testified that an individual with Plaintiff's background and RFC could work as a bench assembler, electronics worker, or production assembler. (R. 1888-89). Given the ALJ's interpretation of this Court's remand order, the Court finds no violation of the law of the case doctrine and declines to remand the case on that basis.

This does not fully resolve the matter, however, because the Court's actual concern with the off task finding was that it conflicted with Plaintiff's testimony that he would be off task due to pain while switching positions, regardless of the nature of the job. (Doc. 15, at 9-10). The ALJ failed to address that issue in his original decision. The regulations describe a two-step process for evaluating a claimant's own description of his impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2. If there is such an impairment, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id*. In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, . . . and justify the finding with specific reasons." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

The Court is to give the ALJ's assessment of a claimant's subjective symptom allegations "special deference and will overturn it only if it is patently wrong," i.e., if it "lacks

any explanation or support." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (internal quotations omitted); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). A reviewing court should rarely disturb a subjective symptom assessment, as it lacks "the opportunity to observe the claimant testifying." *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). The claimant bears the burden of showing that an ALJ's subjective symptom evaluation is "patently wrong." *See Horr v. Berryhill*, 743 F. App'x 16, 20 (7th Cir. 2018).

Plaintiff testified that prior to the DLI, it would take him three to five minutes to stand from a seated position while gripping the arms of the chair for assistance, and the movement caused him pain. (R. 258, 1872). Based on this testimony, Plaintiff wonders "how could [he] not be off-task while changing positions?" (Doc. 15, at 9). On remand, the ALJ expressly acknowledged this testimony but found it inconsistent with objective medical evidence. To begin, Plaintiff never told his treating physician that he had difficulty changing positions, and the issue was never documented in the medical record. (R. 1798). More importantly, as discussed earlier, Plaintiff did not seek any medical treatment for chronic back pain or related neck or leg pain between August 2007 and November 4, 2013, though he routinely pursued treatment for other conditions.[2] (R. 1798). "An ALJ is entitled to consider the course of a claimant's treatment" in evaluating his subjective statements. *Prill v. Kijakazi*, 23 F.4th 738, 749 (7th Cir. 2022).

The ALJ found it significant that even after Plaintiff started complaining of back pain and related neck and leg pain, physical exams documented only normal gait and posture with no discussion of any abnormalities. (R. 1798). *Thorps v. Astrue*, 873 F.

---

[2]    As noted, Plaintiff complained to Dr. Adrian of chronic back, neck, and leg pain in April 2013 but he made no reference to such pain during appointments in May, August and September 2013.

Supp. 2d 995, 1006 (N.D. Ill. 2012) (citing *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007)) ("[A] patient's subjective complaints are not required to be accepted insofar as they clashed with other, objective medical evidence in the record.").  In fact, it appears that Plaintiff's back pain did not become a meaningful problem for him until after he tried to move a grandfather clock in January 2014.  (R. 580, 1799).  And though Plaintiff did need lumbar fusion surgery in March 2014, he did not seek back treatment again until March 2015, nearly a year later.  (R. 1221-22; 1237).  Absent evidence that Plaintiff experienced debilitating back, neck, or leg pain, or had any related functional limitations that began prior to the DLI and lasted 12 consecutive months, the ALJ's decision to discredit his testimony that he would be off task when changing positions due to such pain is not patently wrong.  *See Dawson v. Colvin*, No. 11 C 6671, 2014 WL 1392974, at *10 (N.D. Ill. Apr. 10, 2014) (citing *Schreiber v. Colvin*, 519 F. App'x 951, 961 (7th Cir. 2013)) ("The ALJ's credibility assessment need not be perfect; it just can't be patently wrong.").

Plaintiff next objects that the ALJ improperly found him capable of occasionally lifting 20 pounds and frequently lifting 10 pounds despite his history of cubital and carpal tunnel syndromes.  (Doc. 15, at 11-12).  In rejecting a greater limitation, the ALJ reasonably determined that it was inconsistent with the objective medical record.  Plaintiff first complained of occasional numbness and tingling in the fingers of both hands when he saw his treating primary care physician in January 2009.  (R. 503, 1794).  His physician diagnosed the problem as possible carpal tunnel syndrome and prescribed braces for Plaintiff's wrists.  Plaintiff reported in February 2009 that the braces had alleviated his symptoms.  (R. 501, 504, 1794).

Plaintiff did not seek further treatment for wrist pain until three years later. On September 5, 2012, Plaintiff reported numbness in his left hand and said that at certain points in the past his hand had gone completely numb. (R. 427, 1794). On examination, Plaintiff had decreased sensation to light touch along the left ulnar nerve and was diagnosed with cubital tunnel syndrome. An electromyography/nerve conduction velocity (EMG/NCV) study performed that day confirmed the diagnosis. (R. 428-29, 1794). On September 25, 2012, Plaintiff underwent a left ulnar nerve decompression and anterior transposition. (R. 440, 1794). He reported doing well in November 2012. (R. 440). Ten months later, on September 5, 2013, Dr. Adrian referred Plaintiff to neurologist Pradeep Bhatia, M.D., due to complaints of numbness around the left elbow and tingling in the fourth and fifth digits of the left hand. (R. 464, 538-40, 1794). On September 17, 2013, Dr. Bhatia performed another EMG/NCV study which revealed mild ulnar sensory neuropathy at the wrist. (R. 464, 1794). Dr. Bhatia advised Plaintiff to wear a brace for three months to alleviate symptoms. (*Id.*). The EMG/NCV study also found evidence of moderate carpal tunnel syndrome, and Dr. Bhatia indicated that Plaintiff would probably need surgery to correct the problem. (R. 464, 472, 1794-95).

On November 19, 2013, orthopedic surgeon Suresh Velagapudi, M.D. examined Plaintiff and agreed that he would need a left carpal tunnel release. (R. 472). Dr. Velagapudi performed the procedure on December 6, 2013. (R. 469, 1795). At Plaintiff's first (and apparently only) post-surgery appointment, he demonstrated good motion and sensation. (R. 467-68). There is no evidence in the record that Plaintiff sought further treatment for his left hand or arm again until June 23, 2015, more than a year and a half after the December 31, 2013 DLI. (R. 1199, 1264, 1795).

Plaintiff ignores evidence of his improved left arm and hand functioning after the surgeries and fails to explain how the medical records support his claim of severe limitations and difficulties lifting.  No treating physician indicated that Plaintiff had any restrictions on using his left arm and hand aside from wearing a brace.  Moreover, the State agency reviewers both agreed that prior to the DLI Plaintiff was able to occasionally lift 20 pounds and frequently lift 10 pounds and had no manipulative limitations at all.  (R. 72-73, 84-85).  The ALJ incorporated these exact restrictions into the RFC.  (R. 1796).

All that remains are Plaintiff's subjective statements.  (Doc. 15, at 11-13).  Plaintiff testified that when he was diagnosed with cubital tunnel syndrome in September 2012, he was experiencing "tingling and numbness" in his left hand and had trouble grabbing and holding various items, such as a pencil.  He also sometimes hit the wrong keys as he was typing, though he did not have any trouble writing with a pen since he is right-handed.  (R. 1863-64).  Plaintiff estimated that he could perform repetitive tasks with his left hand, such as loading a dishwasher, for only five minutes before his arm felt sore with numbness and tingling.  (R. 1869).  He also complained of hand stiffness and soreness, difficulty using a can opener and chopping food due to hand cramping, difficulty picking up coins, and difficulty opening twist jars.  (R. 255, 257).

In rejecting this testimony, the ALJ relied in part on statements from Plaintiff's wife that he was able to use a computer to manage/research stocks and 401k savings and did not have trouble using his right hand.  (R. 1798).  The ALJ concluded from these statements that Plaintiff "was able to accommodate for any decrease in the use of his left hand for fine manipulation long enough to perform computer-based activities."  (*Id.*).  Plaintiff argues this was improper because there was no evidence that he did most of his

typing with the right hand, and because even if he did, the VE testified that an individual who could not handle and finger with his left hand longer than 10 minutes at a time would not be able to perform light work. (Doc. 15, at 12) (citing R. 1901). The Court agrees that absent more information as to how frequently Plaintiff typed on the computer at home, and the nature of that typing, his wife's testimony is not a compelling reason to discount Plaintiff's statements regarding his left hand limitations.

Regardless, "[n]ot all of the ALJ's reasons [for disbelieving a claimant] must be valid as long as *enough* of them are . . ." *Halsell v. Astrue*, 357 F. App'x 717, 722-23 (7th Cir. 2009) (emphasis in original). *See also Tina I. v. Kijakazi*, No. 3:20-CV-50327, 2022 WL 80245, at *5 (N.D. Ill. Jan. 7, 2022). For reasons already stated, the ALJ fairly determined that Plaintiff's testimony regarding his left hand and arm limitations is not supported by objective evidence. (R. 1798). As noted, after Plaintiff's first surgery on September 25, 2012, he went nearly a year until September 5, 2013 without seeking additional treatment for his left hand and arm. And after the second surgery on December 6, 2013, he went more than a year and a half without seeking such treatment despite pursuing care for other conditions. This minimal treatment undermines Plaintiff's allegations of disabling symptoms in his left upper extremity. *Prill*, 23 F.4th at 749; *Joe R. v. Berryhill*, 363 F. Supp. 3d 876, 885 (N.D. Ill. 2019) ("The absence of complaints where it would have been natural to have made them is a substantial basis for rejecting or discounting" a plaintiff's complaints).

Moreover, in adopting the State agency reviewers' lifting and carrying restrictions, the ALJ expressly considered that the lower weight contemplated by light work would "account[] for the possibility that residual numbness or pain in [Plaintiff's] left hand even

after cubital tunnel release might interfere with his ability to maintain his grip if he had to lift or carry heavier objects." (R. 1799). No treating physician imposed greater limitations. Once again, the ALJ's decision to discredit Plaintiff's testimony regarding his inability to use his left hand and arm prior to the DLI is not patently wrong. *See Dawson*, 2014 WL 1392974, at *10 (citing *Schreiber*, 519 F. App'x at 961) ("The ALJ's credibility assessment need not be perfect; it just can't be patently wrong.").

Plaintiff's last objection to the RFC is that the ALJ failed to properly accommodate his difficulties paying attention due to side effects from pain medication. (Doc. 15, at 13). Plaintiff testified during the hearing, however, that he did not experience any side effects from his medications during the relevant time. (R. 1880-81). The ALJ nonetheless acknowledged that Plaintiff received prescriptions for pain medication that "might cause decreased ability to pay attention to the surroundings if working in a hazardous work environment." (R. 1801). For this reason, the ALJ limited Plaintiff to working in non-hazardous environments, meaning: no driving at work; no operating moving machinery; no working at unprotected heights; no working around exposed flames or unguarded large bodies of water; and no concentrated exposure to unguarded hazardous machinery. (*Id*.). Plaintiff insists this was inadequate, speculating that he may have been off task a work-preclusive 10% of the workday due to his medications. (Doc. 15, at 13). In making this argument, Plaintiff ignores that the ALJ adopted the State agency reviewers' opinions that Plaintiff's potential medication side effects were accommodated by avoiding workplace hazards. (R. 73, 86). No physician of record found Plaintiff more limited in his ability to concentrate or imposed greater functional restrictions related to paying attention or

staying on task.  In such circumstances, the ALJ's decision to reject Plaintiff's complaints of disabling medication side-effects was not patently wrong.

Viewing the record as a whole, the ALJ did not commit reversible error in determining Plaintiff's RFC.  The ALJ adequately addressed the objective medical evidence supporting his decision and reasonably discounted Plaintiff's subjective statements concerning his inability to change positions without being off task due to pain, to use his left hand and arm, and to pay attention due to medication side-effects.  Plaintiff's request to reverse the case for further analysis of the RFC is denied.

### C.    Subjective Allegations

Plaintiff finally objects that the ALJ relied too heavily on his activities of daily living in discounting his subjective allegations of pain.  It is proper for an ALJ to consider a claimant's activities of daily living when evaluating the severity of his symptoms.  SSR 16-3p.  Here the ALJ considered that during the relevant period, Plaintiff: served as a caregiver for his wife with multiple sclerosis and did "almost everything" to assist her, including helping her get dressed; maintained the home without outside help; did most of the cooking; and sat for hours at a computer.  (R. 1793, 1797-98, 1865-66).  Contrary to Plaintiff's assertion, the ALJ also acknowledged Plaintiff's limitations in performing these activities:  (1) Plaintiff "would try to help" his wife get dressed; (2) Plaintiff relied mostly on heating frozen foods because he could not stand for long enough to cook; (3) if Plaintiff's wife fell he had to call a friend or emergency services to help get her back up; and (4) Plaintiff maintained the home "as best as possible."  (*Id*.).

It is true that the ALJ did not discuss every one of Plaintiff's activities, and may have placed too much emphasis on Plaintiff's belief that he could move a grandfather

clock in January 2014. (R. 1799). Regardless, there is no evidence that the ALJ improperly equated Plaintiff's ability to perform activities of daily living with an ability to work. *See Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (ALJ reasonably "considered Loveless's description of his daily activities in assessing whether his testimony about the effects of his impairments was credible or exaggerated."). Moreover, as noted, "[n]ot all of the ALJ's reasons [for disbelieving a claimant] must be valid as long as *enough* of them are . . ." *Halsell*, 357 F. App'x at 722-23 (emphasis in original). The ALJ provided several valid reasons for discounting Plaintiff's complaints of disabling limitations, including their inconsistency with objective evidence and Plaintiff's ability to go for long stretches without receiving treatment for conditions he claims were debilitating, in addition to Plaintiff's ability to perform various activities of daily living. The ALJ also credited some of Plaintiff's testimony when he limited him to light work with various postural restrictions to account for his difficulties bending and lifting, and allowed him to alternate positions every 30 minutes. (R. 1799).

Viewing the record as a whole, the ALJ's credibility assessment was not patently wrong and the case need not be remanded for further consideration of that issue. *Dawson*, 2014 WL 1392974, at *10.

## **CONCLUSION**

For the reasons stated above, Plaintiff's request to reverse or remand the ALJ's decision is denied, and the Commissioner's Motion for Summary Judgment [18] is granted. The Clerk is directed to enter judgment in favor of the Commissioner.

ENTER:

Dated: June 3, 2022

SHEILA FINNEGAN
United States Magistrate Judge